NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

JUL 8 2026

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

THE ESTATE OF PAUL BROWNING ex rel. BETTY BROWNING,

Plaintiff - Appellant,

v.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT; MICHAEL BUNKER; ROBERT LEONARD; GREGORY BRANON; DAVID RADCLIFFE; DAVID R. HORN,

Defendants - Appellees.

No. 24-2034

D.C. No.
2:20-cv-01381-KJD-MDC

MEMORANDUM*

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted April 9, 2025
San Francisco, California

Before: SCHROEDER, S.R. THOMAS, and MILLER, Circuit Judges.
Partial Concurrence and Partial Dissent by Judge Miller.

In 1986, Paul Browning was convicted of murder in Nevada state court and

sentenced to death. Years later, after successfully pursuing federal habeas corpus

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

relief, he was released from custody. *See Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017). He brought this action under 42 U.S.C. § 1983 against the Las Vegas Metropolitan Police Department (LVMPD) and the individual officers involved in his criminal case. The district court granted summary judgment to the defendants. Browning's estate (the Estate), which has been substituted as the plaintiff, now appeals.

We have jurisdiction under 28 U.S.C. § 1291. We reverse the grant of summary judgment with respect to: (1) the Estate's claims of suppression of evidence against Officer Gregory Branon based on the hairstyle evidence and against Branon and Officer David Radcliffe based on the shoeprint evidence; (2) the Estate's claim of municipal liability against the LVMPD; and (3) the Estate's state-law claim for intentional infliction of emotional distress against Branon, Radcliffe, and the LVMPD. In all other respects, we affirm.

1. The Estate has created a genuine issue of material fact with respect to two of its three claims under *Brady v. Maryland*, 373 U.S. 83 (1963), and the analogous state-law doctrine. As an initial matter, we reject the Estate's argument that our decision in Browning's habeas case has an issue-preclusive effect in resolving the *Brady* claims. Because the defendants in this case were not parties to Browning's federal habeas proceedings, issue preclusion does not apply. *See Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992).

To establish the civil liability of individual officers who suppressed evidence, a plaintiff must show both that the officers violated his constitutional rights under *Brady* and that the violation was clearly established at the time. *See Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1218 (9th Cir. 2015). A section 1983 claim based on an officer's *Brady* violation requires a plaintiff to show that "(1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense, (2) the suppression harmed the accused, and (3) the officer 'acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors.'" *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018) (quoting *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1087, 1089 (9th Cir. 2009)).

The Estate has made a sufficient showing on all three elements to proceed to trial. First, the record creates a genuine issue of material fact as to whether some of the individual defendants suppressed hairstyle and shoeprint evidence that was favorable to Browning. As one of the first officers to arrive at the crime scene, Branon was able to communicate with the still-lucid victim, Hugo Elsen, who described the perpetrator's hair as "shoulder length" and "moist or wet," with "loose" curls. But this specific description was never provided to the defense; instead, based on his own understanding of black hairstyles, Branon summarized the perpetrator's hairstyle in his police report as a shoulder-length Jheri curl. At

trial, Browning, who had an Afro, pointed out that he did not match Elsen's description, and the prosecutor responded by arguing, "couldn't someone, some white person, not really knowing the true definition of J[h]eri curl, seen this, not knowing that it is a round Afro or anything, they see it sticking out of the bottom of a cap, tell the officer that it looks to them like a J[h]eri curl?" That made "the exact words [Elsen] used to describe his assailant evidence favorable to the defense under *Brady*." *Browning*, 875 F.3d at 463. Had those words been disclosed, they would have bolstered Browning's argument that he could not have been the man Elsen described.

Similarly, when Branon arrived at the scene—before the paramedics—he observed bloody shoeprints on the floor. He did not include that observation in his report, and neither did Radcliffe, who arrived around the same time as Branon and would have "been able to see that the footprints were there prior to anyone else arriving." Instead, Criminal Specialist David R. Horn, who began collecting evidence after paramedics transported Elsen to the hospital, simply noted that "[u]pon entering the store a series of footsteps bearing a tennis shoe pattern were observed on the floor." At Browning's trial, Horn testified that the tennis-shoe pattern did not match Browning's footwear, but he implied that they could have been left by the paramedics, who often wore tennis shoes. Although Browning was cleared of being the source of the bloody shoeprints, the evidence was rendered

largely meaningless by Branon's and Radcliffe's failure to disclose when the shoeprints were first observed. Had the timing been disclosed, "Browning could have used that evidence to bolster his contention that the shoeprints were left by the real killer." *Browning*, 875 F.3d at 461.

Second, the Estate has presented enough evidence that the withheld evidence was material to Browning's criminal case to create a genuine dispute of material fact about whether the suppression harmed him. *See Mellen*, 900 F.3d at 1096 (applying a materiality standard to evaluate the second element of a section 1983 claim based on a *Brady* violation). Withheld evidence is material if, when the evidence is considered collectively, there is a reasonable probability that the result of the criminal proceeding would have been different had the evidence been disclosed. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). Here, because the suppressed hairstyle and shoeprint evidence tends to exculpate Browning and bolster the theory that he was not the perpetrator, that evidence creates a "probability sufficient to undermine confidence in" the jury's guilty verdict. *Bagley*, 473 U.S. at 682; *see Browning*, 875 F.3d at 464–65 (explaining the materiality of the suppressed evidence).

Third, the Estate has shown a genuine dispute of material fact as to the individual defendants' state of mind. Whether a defendant acted with the required mental state is ultimately "a question of fact subject to demonstration in the usual

ways, including inference from circumstantial evidence." *Mellen*, 900 F.3d at 1101 (quoting *Lemire v. California Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013)).

Viewing the facts in the light most favorable to the Estate, the evidence supports reasonable inferences that the officers acted with deliberate indifference to, or reckless disregard for, Browning's constitutional rights in failing to disclose both the hairstyle and the shoeprint evidence. Although Elsen was the eyewitness who described Browning's hairstyle, Branon was the one who described the perpetrator's hairstyle as a Jheri curl. Critically, Branon admitted that he was "surprised" when he learned that Browning was arrested for the crimes because Browning's hairstyle did not match the physical description of "shoulder length loose curled hair." Branon's surprise suggests that he recognized the importance of the hairstyle evidence—or so a jury could infer. Nevertheless, Branon did not disclose Elsen's first-hand description of Browning's hair.

The same is true with respect to the bloody shoeprints. Branon, who saw the bloody shoeprints when he first arrived at the crime scene, understood that they were important because they led from the victim to the door. Indeed, Branon deemed the evidence sufficiently important that he sought to prevent Elsen's wife from stepping in the blood. And Branon admitted that he thought there was a "distinct possibility" that the shoeprints belonged to the killer. Because Branon

understood that the shoeprint evidence was probative, a jury could conclude that his failure to disclose that he saw the footprints *before* anyone else arrived showed a reckless disregard for Browning's *Brady* rights. A reasonable jury could find that Radcliffe, as one of the first officers to arrive at the crime scene, also knew that the bloody shoeprints were present before the paramedics arrived. Because Radcliffe had personal knowledge of the crucial fact that made the shoeprint evidence exculpatory, a reasonable jury could find that he suppressed exculpatory evidence with deliberate indifference or reckless disregard for Browning's rights.

By contrast, we are not persuaded by the Estate's argument that the officers suppressed evidence of the unreliability of two prosecution witnesses, Randy and Vanessa Wolfe. Although some of that evidence was omitted from the police report, the Wolfes' drug addiction and criminal history were ultimately explored at Browning's criminal trial. For example, Randy admitted that both he and his wife habitually used illegal drugs, and that he had been arrested for stealing and convicted of felonies.

As to the second prong of the qualified-immunity inquiry, the officers do not dispute that the relevant *Brady* principles were clearly established at the time. *See Carrillo*, 798 F.3d at 1219. Because the Estate meets both prongs of the qualified-immunity analysis, we reverse the district court's summary judgment in favor of the defendants and remand to allow the evidence-suppression claim to proceed to

trial against Branon with respect to the hairstyle evidence and against Branon and Radcliffe with respect to the shoeprint evidence. We affirm the grant of summary judgment on the *Brady* claim based on the evidence provided by the Wolfes.

2. We reject the Estate's effort to hold Horn, Sergeant Michael Bunker, and Detective Robert Leonard liable for the *Brady* violations on failure-to-intervene or civil conspiracy theories.

"[A]n official whose 'individual actions' do 'not themselves rise to the level of a constitutional violation' may be held liable under section 1983 only if the official is an 'integral participant' in the unlawful act." *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022) (quoting *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020)). There is no evidence of a common plan among the officers to work together to suppress the evidence, nor is there evidence that the officers (other than those we have identified above as potentially facing direct liability for the *Brady* violation) set in motion acts that they knew or should have known would cause a *Brady* violation. *Id.* at 892.

The claim of civil conspiracy under section 1983 fails because the law at the time did not clearly establish that officers from the same police department could be held liable for a civil conspiracy. *See Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017) (explaining disagreement among circuits as to whether agents of the same legal entity are distinct enough to conspire with one another under 42 U.S.C. § 1985(3)).

And the conspiracy claim under state law fails because Nevada recognizes the intracorporate-conspiracy doctrine, which precludes liability when employees of the same department act in their official capacities. *See Collins v. Union Fed. Sav. & Loan Ass'n*, 662 P.2d 610, 622 (Nev. 1983).

3. We assume without deciding that the officers' use of a show-up identification on the day of the murder violated Browning's due-process rights because the procedure was so suggestive and unreliable that misidentification likely occurred. Nevertheless, the officers are entitled to qualified immunity because the law at the time did not clearly establish that the identification procedure was unconstitutional. The district court therefore correctly granted summary judgment on that claim.

The Supreme Court has repeatedly admonished us "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). We therefore consider whether the law at the time put the officers on notice that their specific procedure—a one-person show-up during which the suspect was placed in a police car—was unconstitutional.

The Estate relies principally on *Simmons v. United States*, but that case is inapposite. 390 U.S. 377 (1968). In *Simmons*, the police obtained photographs of a suspected bank robber and showed them alongside photographs of a possible accomplice to five bank employees who had witnessed the robbery the day before.

*Id.* at 380. Here, by contrast, the police presented Browning to eyewitnesses in person and less than an hour after the police call. Other cases cited by the Estate similarly did not evaluate identification procedures comparable to the one used here and could not have put the officers on notice that their specific show-up procedure was impermissible. *See, e.g.*, *Manson v. Brathwaite*, 432 U.S. 98, 101 (1977) (photographic identification of a single suspect by an undercover police officer); *Neil v. Biggers*, 409 U.S. 188, 193, 195 (1972) (show-up identification of a youth suspect by the victim herself); *United States v. Wade*, 388 U.S. 218, 220 (1967) (line-up identification involving at least six individuals); *see also Foster v. California*, 394 U.S. 440, 441 (1969) (suggestive line-up procedure in which only the defendant was wearing clothing similar to that of the perpetrator).

The Estate suggests in passing that its unreliable-identification argument may separately support a claim under state law. Because the argument is not developed—and was not mentioned in the Estate's summary-judgment briefing— we consider it forfeited. *See Pritchard ex rel. C.P. v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646, 660 (9th Cir. 2025).

4. Criminal defendants have a due-process right "not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc). In the absence of direct evidence of falsification, a violation of this right can

be established by circumstantial evidence that either (1) the officers "continued their investigation . . . despite the fact that they knew or should have known that [the suspect] was innocent" or (2) the officers "used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (quoting *Devereaux*, 263 F.3d at 1076); *see Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017). We agree with the district court that the record does not support reasonable inferences of deliberate fabrication, either through direct or circumstantial evidence.

First, the Estate has provided no direct evidence of falsification. That is, the Estate cannot point to any officer who "deliberately mischaracterize[d]" information, such as by deliberately inventing, misrepresenting, or intentionally misquoting witness statements. *Costanich v. Department of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010); *cf. Devereaux*, 263 F.3d at 1079 (noting that "a *Brady* violation cannot in itself support a deliberate-fabrication-of-evidence claim").

Second, the Estate cannot point to any circumstantial evidence of fabrication. *Devereaux* outlined two ways of inferring deliberate fabrication from circumstantial evidence, 263 F.3d at 1076, but both methods require knowledge on the part of the officers, *see Spencer*, 857 F.3d at 799. Here, the officers did not

11                                                    24-2034

have actual or constructive knowledge of Browning's innocence at the time of their investigation. There was at least some undisputed evidence—for example, Browning's fingerprints on the glass fragments in Elsen's store—that tied him to the crimes. Nor did the officers "knowingly use[] coercive and abusive techniques" when they interviewed the eyewitnesses. *Id.*

5. Under *Monell v. New York City Department of Social Services*, plaintiffs may bring section 1983 actions against municipalities for constitutional deprivations pursuant to a governmental custom or policy. 436 U.S. 658, 690–91 (1978). The Estate's *Monell* claim rests on the theory that the LVMPD failed to adopt policies and train its officers on preserving and disclosing material evidence under *Brady*. A municipality's *Monell* liability may extend to constitutional violations that occurred due to the inadequacy of police training "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *accord Benavidez v. County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021).

Here, there are triable issues as to whether the LVMPD failed to adequately train its officers. Bunker and Lieutenant Jolley could not remember receiving any such training. Jolley testified that he assumed that the LVMPD had policies and trainings on disclosing evidence and documenting information from witnesses, but he could not recall anything further. The LVMPD's policy manual included just a

single sentence concerning an officer's duty not to fabricate, withhold, or destroy evidence, and an expert testified that the department's policies were generalized and gave inadequate direction to officers. And indeed, as discussed above, the record reflects that several defendants failed to record and disclose hairstyle and shoeprint evidence that was favorable to Browning, and that they used suggestive and unreliable identification procedures.

Construing this evidence in the Estate's favor, a reasonable jury could infer that the LVMPD failed to adopt policies and adequately train the officer defendants, demonstrating deliberate indifference to Browning's constitutional rights. *See Benavidez*, 993 F.3d at 1153–54 (9th Cir. 2021). Accordingly, we reverse the district court's grant of summary judgment as to the Estate's *Monell* claim.

6. The Estate also asserts Fourth Amendment and state-law claims for malicious prosecution and related torts. "[T]he gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause." *Thompson v. Clark*, 596 U.S. 36, 43 (2022). Therefore, "probable cause is an absolute defense to malicious prosecution." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054–55 (9th Cir. 2009); *see also Jordan v. Bailey*, 944 P.2d 828, 834 (Nev. 1997) (same under Nevada law).

The Estate's claim fails because the Estate cannot establish a lack of probable cause. Even setting aside the evidence that the Estate now challenges as unreliable or fabricated, there remain undisputed facts in the record that reflect a sufficient probability of Browning's involvement in the crimes to justify his arrest and detention. The officers apprehended Browning in a motel room and found a blue cap, knife, and jewelry nearby; a witness positively and unequivocally identified Browning as the assailant; and, as noted, Browning's fingerprints were found on glass fragments from the jewelry store. The district court therefore correctly granted summary judgment to defendants. *See McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (explaining that while probable cause is "generally" a question for the jury, summary judgment is appropriate "if no reasonable jury could find that the officers did or did not have probable cause to arrest").

7. We reverse the grant of summary judgment on the Estate's intentional infliction of emotional distress claim as to Branon, Radcliffe, and the LVMPD. Under Nevada law, such a claim has three elements: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Star v. Rabello*, 625 P.2d 90, 92 (Nev. 1981). The parties dispute only the first element. Viewing the evidence in the light most

14                                                                                    24-2034

favorable to the Estate, we conclude that there is a genuine dispute of material fact as to whether Branon, Radcliffe, and the LVMPD acted with reckless disregard for Browning's innocence when they withheld exculpatory evidence and therefore engaged in extreme and outrageous conduct. *Cf. Rivera v. Corrections Corp. of Am.*, 999 F.3d 647, 655 (9th Cir. 2021) (finding a triable issue of fact as to whether detaining an inmate for a year without arraignment was sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress under Nevada law). Branon and Radcliffe face potential liability because they were involved in at least one of the possible *Brady* violations, and the LVMPD is potentially liable on a respondeat superior theory. A jury should make the factual determination about whether these defendants' *Brady* violations were intended to cause emotional distress or done with reckless disregard as to such a probability such that they amount to extreme and outrageous conduct. *See Posadas v. City of Reno*, 851 P.2d 438, 456 (Nev. 1993).

8. We affirm the grant of summary judgment on the abuse-of-process claim. Under Nevada law, the tort of abuse of process requires establishing "(1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding." *Kovacs v. Acosta*, 787 P.2d 368, 369 (Nev. 1990). The first element typically requires a motive unrelated to the legal process itself. *See, e.g.*, *Posadas*,

851 P.2d at 445. Here, the Estate has not presented evidence of any motive beyond the officers' usual purpose in investigating criminal suspects.

9. Lastly, we address the Estate's procedural and evidentiary challenges. First, the Estate argues that the district court erred in its near-verbatim adoption of the defendants' proposed summary-judgment order. In general, we disapprove of the "[w]holesale adoption of one side's proposed findings of fact and conclusions of law." *Northern Stevedoring & Handling Corp. v. International Longshoremen's & Warehousemen's Union, Loc. No. 60*, 685 F.2d 344, 350 (9th Cir. 1982); *see also Photo Elecs. Corp. v. England*, 581 F.2d 772, 776–77 (9th Cir. 1978). Here, however, the district court responded to some of the Estate's objections in a separate order, demonstrating that it independently evaluated and considered the Estate's position.

Second, the Estate contends that the district court displayed bias, but the contention is baseless. Nothing in the record suggests that the district court will have difficulty "taking a fresh approach to the case on remand." *Smith v. Mulvaney*, 827 F.2d 558, 563 (9th Cir. 1987). The Estate has not come close to showing that reassignment is warranted.

Third, the Estate contends that the district court erred in rejecting, as inadmissible hearsay, Browning's 1989 affidavit prepared for the criminal trial and his 1999 testimony at the state habeas evidentiary hearing. Because Browning died

before he could be deposed in this case, his affidavit and testimony are out-of-court statements by an unavailable declarant being offered to "prove the truth of the matter asserted." Federal Rule of Evidence 801(c); *see also* Federal Rule of Evidence 804(a)(4).

The district court did not abuse its discretion in refusing to admit Browning's affidavit under the residual hearsay exception in Federal Rule of Evidence 807. Rule 807 "exists to provide judges a 'fair degree of latitude' and 'flexibility' to admit statements that would otherwise be hearsay," and we have given "wide discretion" to district courts in applying it. *United States v. Bonds*, 608 F.3d 495, 501 (9th Cir. 2010) (quoting *United States v. Valdez–Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994)). The affidavit does not involve the kind of "exceptional circumstances" contemplated by Rule 807. *See id.* at 501–02. The district court's rejection of the affidavit was within the bounds of its discretion.

But the district court abused its discretion by refusing to admit Browning's prior testimony under Federal Rule of Evidence 804(b)(1). The defendants dispute only whether the State of Nevada had a "similar motive" to develop the testimony at the evidentiary hearing. We have held that similarity of motive should be assessed "at a high level of generality." *United States v. McFall*, 558 F.3d 951, 962–63 (9th Cir. 2009); *see United States v. Salerno*, 505 U.S. 317, 326 (1992) (Blackmun, J., concurring). We are satisfied that the motives are sufficiently

similar. Both the state habeas petition and this section 1983 action are based on the same set of facts. Although Browning's arguments in the state habeas proceeding focused on ineffective assistance of counsel, the proceeding concerned the same underlying issues that the Estate now raises, including the suppression of the hairstyle and shoeprint evidence and the reliability of the eyewitness identification procedure. *See Browning*, 875 F.3d at 455–58. At the evidentiary hearing, the State also had an opportunity to cross-examine Browning, who discussed the alleged Cuban perpetrator, the hairstyle differences, and his prior felony convictions. Thus, the State and the defendants here share "very similar—if not the same—motive[s] in both proceedings." *United States v. Geiger*, 263 F.3d 1034, 1038 (9th Cir. 2001). We reverse the district court's exclusion of Browning's former testimony, which should be considered on remand to the extent it is relevant to whether the suppressed evidence was material to Browning's criminal case.

The parties shall bear their own costs on appeal.

**AFFIRMED in part and REVERSED in part; REMANDED.**

*The Estate of Paul Browning ex rel. Betty Browning v. Las Vegas Metropolitan Police Department, et al.*, No. 24-2034

MILLER, Circuit Judge, concurring in part and dissenting in part:

I join the court's disposition except as to part 5, which reverses the grant of summary judgment on the Estate's *Monell* claim.

A municipality's *Monell* liability may extend to constitutional violations that occurred because of its failure to train its police officers, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The Supreme Court has cautioned that the deliberate-indifference standard must be applied strictly, lest failure-to-train claims result in "*de facto respondeat superior* liability." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Canton*, 489 U.S. at 392); *see id.* at 61 (noting that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train"). And "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62.

The Estate has not demonstrated that the LVMPD was aware of any inadequacy in its training program, nor has the Estate pointed to a pattern of similar *Brady* violations by LVMPD officers. At most, the Estate can show that one of the individual defendants could not recall the specific *Brady*-related training he

1

received decades earlier. But "evidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy." *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007). Because insufficient evidence supports the inference that the LVMPD had notice of the need to provide additional training, I would affirm the district court's grant of summary judgment on the Estate's *Monell* claim.